HAWKINS, Presiding Justice,
for the court:
Jeff C. Anderson, as legal representative of George B. Anderson, deceased, appeals from a judgment of the circuit court of Leflore County against Hensley-Schmidt, an engineering firm with offices in Jackson. Because of the error of the circuit court in granting a contributory negligence instruction, we reverse.
FACTS
On October 19, 1979, George B. Anderson and Boyd Lewis Kilpatrick were manual laborers employed by Georgia Electric Company of Albany, Georgia (Georgia Electric), an electrical contractor. On August 2, 1979, Georgia Electric was the successful bidder for relocation and installation of traffic signal devices, which in turn was part of a revitalization of the downtown business district of the City of Greenwood (Greenwood). The city had its own electric utility, Greenwood Utilities (Utility), which operated under Miss. Code Ann. §§ 21-27-11, 21-27-13.
Prior to the construction of this project, Greenwood, on September 25,1978, entered into a contract with Hensley-Schmidt, Inc., for consulting and supervisory services for the entire project. Hensley-Schmidt engaged in traffic engineering, civil engineering, sanitary and waste disposal, water systems, and road designs. The contract between Greenwood and Hensley-Schmidt obligated the latter to exercise some safety control in the project construction. The Mississippi Standard Specifications for Road and Bridge Construction, 1976 Edition (sometimes called the “Red Book”), which was incorporated by reference into the contract between Greenwood and Georgia Electric, authorized the Engineer to suspend work due to failure to correct unsafe work conditions. The Engineer was the city engineer of Greenwood (Frank Jones) or his duly authorized representative, in this case Hensley-Schmidt.[1]
On October 19 one task of the Georgia Electric crew was to install a 35 foot concrete pole at the southwest corner of the intersection of Fulton and Henry Streets in Greenwood. The pole was to be inserted in a hole six feet in depth, leaving the pole 29 feet high when erected. Georgia Electric had a truck and trailer equipped to emplace light poles.
Barry Hall was Georgia Electric’s project manager. Charles Goodbar was superintendent for the job crew. Keith Lott was the inspector for Hensley-Schmidt.
Shortly after 1:00 p.m. Hall and Lott were at this site discussing the project. Hall said that he was going to Memphis, and, accordingly left instructions with Goodbar not to erect the pole until the Utility was contacted to cover a high voltage line which would be only a foot and seven inches from the pole when it was erected.
Goodbar sent a local laborer, David Lacy, to the Utility’s office to contact Billy W. (Bill) Roberson, superintendent of the Utility, to cover the lines with insulation. Prior to this, Greenwood, the Utility, Georgia Electric and Hensley-Schmidt representatives had all conferred and it was understood and agreed that the Utility would, when requested, take the necessary precautions to protect the Georgia Electric crew when poles were erected at a dangerous proximity to the high voltage lines. All recognized the extreme danger involved in these tasks, and the absolute necessity of taking proper precautions.
While the crew was waiting, Goodbar told Lott that a sewer line may have been broken when the hole was dug, and upon inspection Lott found this to be true. He told Greenwood to wait until Roberson arrived and they could ask him about the sewer line. Goodbar and Lott then left the site momentarily to go to the local bus *183 station to pick up payroll checks, as well as go to the local laundry. Upon returning they found Roberson, who had looked at the damaged sewer line, and who in turn had called Greenwood sewer department to inspect the sewer line. Roberson then said that he had to leave for a few minutes.
Lott also had an appointment in Yazoo City that afternoon, and at 1:45 told Good-bar that he was going to his apartment and pack his clothes, and would be back at the intersection before he left for Yazoo City.
Lott testified that when he returned he found Roberson had returned, and also Jones, the city engineer, as well as C.D. Caraway, an engineer with the state highway department. They were all gathered at the intersection.[2] While this group was assembled across the street, the Georgia Electric crew started raising the pole.
Goodbar testified that he knew the line was uncovered, but he understood that someone in the group across the street signaled to him it was all right to proceed. “They gave a (indicates), just raised their hands with the thumbs-up sign.” He also testified he thought the pole could be inserted without coming in contact with the power line.
Finally, Goodbar testified that as the pole was being raised by the boom, with Anderson and Kilpatrick at the butt end steadying it, that Kilpatrick slipped and Anderson attempted to grab him and also stabilize the pole. In doing so the pole struck the high voltage line and both men were electrocuted.
Jones testified that he was across the street discussing the sewer problem, with his back turned to Goodbar and the Georgia Electric crew. A woman he was talking to said, “Oh, my God,” and he turned to see Anderson and Kilpatrick, with their arms around the pole, fall.
Lott testified that Hensley-Schmidt did not have any authority to interfere with work in progress, even though unsafe, and he did not have the authority to tell the crew to stop. Although he recognized the raising of the poles was dangerous, Lott said he had no authority to stop it, and said nothing.
The legal representatives of Anderson sued Greenwood, the Utility, and Hensley-Schmidt as well (later sued by amended complaint). The action was settled as to Greenwood and the Utility by payment of $88,000, but the cause remained active as against Hensley-Schmidt. Prior to trial a similar cause of action was brought by the legal representatives of Kilpatrick and was consolidated with this cause. Kilpatrick’s representative had also settled with Greenwood and the Utility for $132,000, but the cause remained active as to Hensley-Schmidt.
Prior to trial the circuit judge ordered that any verdict the jury rendered in favor of the plaintiffs would be reduced by the amount each had been paid in settlement.
The jury returned a verdict in favor of Anderson in the amount of $50,000. This verdict meant that the legal representative of Anderson recovered nothing from Hensley-Schmidt, and he has appealed.
The jury also returned a verdict in favor of Kilpatrick in the amount of $300,000, which the circuit court reduced by the amount of $132,000, leaving a net recovery of $168,000, and Hensley-Schmidt in a separate appeal has appealed from that judgment.
LAW
There is only one issue to address on this appeal, the granting of a comparative negligence instruction on behalf of Hensley-Schmidt:
INSTRUCTION NO. DHS-18A
If you find from the preponderance of the evidence in this case that George Anderson and Boyd L. Kilpatrick:
1. knew that the position in which they placed themselves were inconsistent with their safety because they were aware of the danger posed by electrical current; and that they
*184 2. appreciated the danger; and that they
3. deliberately and voluntarily chose to expose themselves to that danger in such as a manner as to assent to the continuance of the dangerous situation,
then George Anderson and Boyd L. Kil-patrick were negligent.
In determining whether George Anderson and Boyd L. Kilpatrick knew that the positions in which they placed themselves were inconsistent with their own safety, you may find either that they actually knew of the condition of the danger or that the circumstances surrounding them were so obviously dangerous to their safety that they should have known of the danger.
If you further find that this negligence was a proximate contributing cause of their death, and if you find for the plaintiffs, then you shall reduce any damages you award in proportion to the negligence you attribute to Anderson and Kil-patrick.[3]
There can be little question of the culpable indifference of Goodbar to the danger to which he was exposing Anderson and Kilpatrick.
The record does not reveal how much time transpired from the moment Lott first noticed Goodbar raising the pole until it struck the power line. Lott did not testify that it happened so suddenly that he had no opportunity to tell Goodbar to stop. From his testimony it can only be gathered that he made a decision to say nothing despite his recognition of the serious hazard.
Hensley-Schmidt had a contractual duty to oversee the construction in progress for safety, and had the authority to stop any work not being performed in a safe manner. The jury would have been justified in finding, therefore, that Hensley-Schmidt was either negligent in failing to recognize its responsibility, or recognizing it, in failing to specifically instruct its employee Lott thereasto. There can be little question but that Lott, had he recognized his job site responsibility, would have been far more personally involved in that particular task than he chose to be that fatal afternoon.
High-powered electrical lines are killers, and any exposure to them must be attended with carefully supervised, tested and proven safeguards.
Goodbar, as we have noted, was clearly grossly negligent. Yet, Goodbar’s negligence as such is not imputable to Anderson or Kilpatrick, whose work he was supervising. Greer v. Pierce, 167 Miss. 65, 147 So. 303 (1933); 65A C.J.S. Negligence, § 166.
Was there any evidence either direct or by reasonable inference, that Anderson was negligent? If so, a contributory negligence instruction was proper.
Of course, if Anderson and Kilpatrick on their own had decided to raise the pole, we would have an entirely different question. Davis v. Singing River Electric Power Ass’n., 501 So.2d 1128 (Miss.1987); Garcia v. Coast Elec. Power Ass’n., 493 So.2d 380 (Miss.1986) (sailboat mast); Miss. Power & Light Co. v. Johnson, 374 So.2d 772 (Miss. 1979) (raised coathanger to touch power line); Tallahatchie Valley Elec. Power Ass’n. v. Clinton, 347 So.2d 348 (Miss. 1977) (antenna); Miss. Power & Light Co. v. Shepard, 285 So.2d 725 (Miss.1973) (raised antenna).
This is not the case here, however. There is nothing in this record to suggest that either Anderson or Kilpatrick had any reason whatsoever to think Goodbar was not careful as well as competent, and perfectly capable of deciding whether or not it was safe to raise the pole. He was their *185 job superintendent, and they assumed their task at his instruction. Moreover, Lott, and the city engineer Jones, were at the job site, and they no doubt had just seen Roberson there a few moments before. For all this record shows these two men knew a decision had been made by competent supervisors that it was safe to raise the pole. Indeed, the very fact that the high-voltage line imposed such a grave danger could have reassured them. If they had confidence in these individuals’ ability, they should have been able to assume that under no circumstances would they have been instructed to proceed without a clear determination that it was safe to do so. In sum, from this record there is nothing to infer negligence on the part of these manual workers Anderson and Kilpatrick.
A sign on a highway reads “Stop. Danger Ahead.” A motorist reading the sign and failing to stop is clearly negligent. But suppose there is a signalman standing next to the sign, and signals the motorist to proceed? Is the motorist negligent in following the signalman’s instructions?
In the absence of something in this record to put Anderson on notice of some kind that Goodbar was incompetent, or that Anderson had at that time failed to take into account some safety precaution, he should not be held to account for Goodbar’s negligence. 65A C.J.S. Negligence, § 162, p. 208.
The facts of this case are closely analogous to Crouch v. Miss. Power & Light Co., 193 So.2d 144 (1967), in which the plaintiff, who was moving his house on a highway, claimed he was directed by a power company serviceman to “take hold of an uninsulated wire and lift it,” thereby receiving a severe electric shock. In that case, however, the plaintiff was not killed, and apparently the evidence was in conflict as to whether the power company representative told the plaintiff to take hold of the line. 193 So.2d at 148.
We find no evidence of contributory negligence on the part of Anderson, and therefore a contributory negligence instruction was improper. Herrington v. Hodges, 249 Miss. 131, 161 So.2d 194, 198 (1964).
This cause is therefore reversed and remanded for a new trial solely on the issue of damages sustained by the appellant Jeff C. Anderson and .his decedent George B. Anderson.
REVERSED AND REMANDED ON ISSUE OF DAMAGES.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.

. At trial Hensley-Schmidt contested the plaintiffs’ claim that it was responsible under its contract for safety supervision. The circuit judge instructed the jury, however, that Hensley-Schmidt did have the responsibility to supervise for safety, and Hensley-Schmidt has not cross-appealed the issue. This issue, therefore, is settled.

. Roberson’s testimony varied from Lott’s. Roberson testified that he was just driving up when he saw the Georgia Electric crew raising the pole.

. Anderson in another assignment also complains that this instruction was confusing as well, mixing assumption of risk with comparative negligence. In view of our conclusion, we need not address this assignment.
There is also an instruction requested by the plaintiff on comparative negligence, and granted by the court as 15A. Hensley-Schmidt makes no mention of this instruction on appeal, however, nor do they claim that the plaintiff by requesting and getting an instruction on comparative negligence waived any objection to the comparative negligence instruction for the defendant.