# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 96-CT-00692-SCT

*ACCU-FAB & CONSTRUCTION, INC. AND ROY ANDERSON CORPORATION*

*v.*

*RICHARD G. LADNER, DECEASED, BY AND THROUGH BEVERLY LADNER, HIS WIDOW, AS HIS PERSONAL REPRESENTATIVE*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 04/16/95 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | RAYMOND BROWN |
| | KELLY SESSOMS |
| | MICHAEL ULMER |
| | FRANK WOOD |
| | JAMES O. DUKES |
| | KAREN K. SAWYER |
| ATTORNEYS FOR APPELLEE: | PAUL MINOR |
| | MARK LUMPKIN |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 02/22/2001 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/15/2001 |

EN BANC.

PITTMAN, CHIEF JUSTICE, FOR THE COURT:

¶1. Richard G. Ladner, a subcontractor's employee, was working on the roof of a casino barge when he fell through a hole in the roof and later died from his injuries. A jury awarded his heirs $2 million in damages against the general contractor and another of its subcontractors. On appeal, the Court of Appeals initially reversed and remanded the judgment based on the jury verdict. The Court of Appeals then granted rehearing and affirmed. The general contractor and the subcontractor each filed a Petition for Writ of Certiorari which we granted. Finding that the Court of Appeals did not err in affirming the judgment, we also affirm.

## FACTS

¶2. Boomtown, Inc., hired Roy Anderson Corporation ("Anderson") as a general contractor in November of 1993 to construct the Boomtown Casino located in Biloxi, Mississippi. Anderson chose to subcontract a

good portion of the work. Among the subcontractors were Accu-Fab & Construction, Inc. ("Accu-Fab"), a metal fabricator, and Bracken Construction Co. ("Bracken"), which employed Ladner as an iron worker.

¶3. Accu-Fab was subcontracted to construct the stairwells and stringers on the barge. Accu-Fab requested that Anderson not install the roof decking until the stairs had been installed. However, as a result of time constraints in the construction, Anderson denied the request and went ahead and decked the entire roof. Accu-Fab sought and obtained permission from Anderson to cut a hole in the roof in order to facilitate installation of the stairway, which it did on Saturday, March 5, 1994. Accu-Fab returned on Sunday, March 6, 1994, to complete installation of the stairs, but because the prefabricated stairway did not fit properly, Accu-Fab was unable to complete the installation, and instead took the stairway back to its shop for refabrication. Neither Accu-Fab nor Anderson placed any warning signs or barricades around the hole or covered the opening in the roof.

¶4. The following Monday morning, March 7, 1994, Ladner fell through the hole cut in the roof and subsequently died from the injuries he received from the fall. Ladner's heirs filed suit against Anderson, Accu-Fab, and Boomtown, Inc., in the Jackson County Circuit Court seeking compensation for Ladner's death. Boomtown, Inc. was dismissed at the start of the trial and, therefore, is no longer a party.

¶5. Because the casino was being constructed on a barge that was on a navigable waterway, Ladner was covered under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § § 901 et seq., which is a workers' compensation program governed by federal law. Because coverage provided by the employer under the Act is an exclusive federal remedy, Bracken, which was Ladner's employer, was not a party to this action. Both Anderson and Accu-Fab sought through jury instructions to have Bracken included in the apportionment of liability, pursuant to Miss. Code Ann. § 85-5-7 (1999). Relying on *McBride v. Chevron U.S.A.*, 673 So. 2d 372 (Miss. 1996), the trial judge denied the requested instructions. The jury returned a verdict of $2,000,000. The jury attributed seventy percent (70%) fault to Anderson, twenty-five percent (25%) to Accu-Fab, and five percent (5%) to Ladner.

¶6. Both Accu-Fab and Anderson appealed, and the case was assigned to the Court of Appeals, which initially reversed and remanded, finding that *Estate of Hunter v. General Motors Corp.*, 729 So. 2d 1264 (Miss. 1999), mandated reversal because the jury was not allowed to apportion liability to Bracken. All of the parties, however, filed motions for rehearing, which were granted. On rehearing, the Court of Appeals affirmed the trial court judgment finding that *Estate of Hunter* was distinguishable from the present case because Bracken was immune as the maritime employer of Ladner. Accu-Fab and Anderson each filed a timely Petition for Writ of Certiorari which we subsequently granted.

## ANALYSIS

### 1. Anderson's failure to warn

¶7. Anderson argues that Bracken was an independent contractor which had knowledge of the hole, and therefore pursuant to this Court's decision in *Jones v. James Reeves Contractors, Inc.*, 701 So. 2d 774 (Miss. 1997), it was not required to warn Bracken about the hole. Therefore, Anderson argues, it was entitled to a directed verdict in its favor. In *Jones*, an employee of McCaskill was killed when a hole being excavated on the premises of Howard Industries collapsed. *Id.* at 776-77. We found that Howard Industries owed no duty to make the premises safe, and then went on to say:

Moreover, even if there existed a duty on the part of Howard to make the premises safe, the only way in which that duty would remain intact is if John McCaskill, Jr., as site supervisor, did not know of the condition of the soil. In *City of Jackson v. Ball*, 562 So.2d 1267, 1270 (Miss.1990), we held that no warning need be given to employees of a contractor so long as the contractor knows of the danger. *See also Mississippi Chemical Corp. v. Rogers*, 368 So.2d 220, 222 (Miss.1979). **Here there may be a dispute as to a material fact**. Reeves claimed that he stopped digging and went and told McCaskill about the watersand under the surface when he observed it, and that McCaskill instructed him to keep digging. McCaskill denies any such conversation ever took place. This conversation, or lack thereof, certainly goes to McCaskill's knowledge of the soil condition.

*Jones*, 701 So.2d at 783 (emphasis added).

¶8. We continued:

**However, it is not the only means by which McCaskill would have knowledge of the soil conditions.** Because he was on the site at all times, and was in fact running the transit to measure the elevation of the hole, he would have had additional opportunity to observe the condition of the subsurface. **It must be pointed out, however, that according to the contract between McCaskill Brothers and Jones County, McCaskill Brothers is chargeable with knowledge of the soil conditions as a prerequisite to signing the contract.** Section 1.2.2 states that *"Execution of the Contract by the Contractor is a representation that the Contractor has visited the site, become familiar with local conditions under which the Work is to be performed and correlated personal observations with the requirements of the Contract Documents."* (emphasis supplied). Thus, according to *Jackson Ready-Mix Concrete*, Howard had no duty to warn of a danger which McCaskill should reasonably have appreciated before exposing himself (and by extension, his employees) to it. **Such an expectation of appreciation is reasonable because *under the contract* McCaskill had visited the site and had familiarized himself with the soil conditions.** Accordingly, we find that for this additional reason, the judgment as to the defendant, Howard Industries, Inc., is affirmed.

*Id.* at 783 (emphasis added).

¶9. In the present case, there is no indication that Bracken had assumed any obligations, contractual or otherwise, to inspect the premises. Additionally, there was certainly a factual question as to whether Bracken had knowledge that the hole had been cut in the roof decking. The jury resolved this question against Anderson. "Factual disputes are properly resolved by the jury and do not mandate a new trial." *Eakes v. State,* 665 So.2d 852, 872 (Miss. 1995)(citing *McNeal v. State*, 617 So.2d 999, 1009 (Miss. 1993)). We therefore find this issue to be without merit.

### 2. Apportionment of fault to Bracken

¶10. At trial, both Anderson and Accu-Fab requested jury instructions which would have required the jury to include Bracken, Ladner's employer, in the apportionment of liability. The trial court denied the instructions, and now both Anderson and Accu-Fab argue that pursuant to *Estate of Hunter v. General Motors Corp.*, 729 So. 2d 1264 (Miss. 1999), the jury should have been allowed to apportion fault to Bracken.

¶11. In *Estate of Hunter*, we held that pursuant to Miss. Code Ann. § 85-5-7, the jury should be allowed to apportion fault to a settling defendant who is no longer a party to the case and in so doing stated:

> This Court agrees with the aforementioned commentators that the policy considerations underlying the comparative fault doctrine would best be served by the jury's consideration of the negligence of all participants to a particular incident which gives rise to a lawsuit. A rule of law limiting a jury to a consideration of the fault of the parties at trial would permit a plaintiff to settle with a defendant primarily responsible for a given accident, file suit against a "deeper pockets" defendant who may bear little if any responsibility for the accident, and thereupon require the jury to allocate all of the responsibility for the plaintiff's injuries between the plaintiff and the non-settling defendant. It would be patently unfair in many cases to require a defendant to be "dragged into court" for the malfeasance of another and to thereupon forbid the defendant from establishing that fault should properly lie elsewhere. Such a procedure invites inequitable results which, in certain cases, could arguably rise to the level of a due process violation.

*Id.* at 1273.

¶12. *Estate of Hunter*, however, does not apply in the present case. Ladner was covered under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § § 901 et seq., and therefore federal maritime standards govern. *Calhoun v. Yamaha Motor Corp.*, 216 F.3d 338 (3rd Cir. 2000). The United States Supreme Court addressed this question in *Edmonds v. Campagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L. Ed. 2d 521(1979).

¶13. In *Edmonds*, a longshoreman employed by a stevedoring concern was injured while unloading cargo from a vessel. *Id.* at 258; 99 S.Ct. at 2755. The injured longshoreman received benefits from his employer under the LHWCA, and in addition he brought a negligence action against the shipowner. The trial court reduced the award to the longshoreman by the ten percent attributed to his own negligence, but refused to reduce the award against the shipowner in proportion to the fault of the employer. *Id.* The United States Supreme Court found that it would be improper to allow such a reduction, and in so doing stated:

> Congress clearly contemplated that the employee be free to sue the third-party vessel, to prove negligence and causation on the vessel's part, and to have the total damages set by the court or jury without regard to the benefits he has received or to which he may be entitled under the Act. Furthermore, under the traditional rule, the employee may recover from the ship the entire amount of the damages so determined. If he recovers less than the statutory benefits, his employer is still liable for the statutory amount.

> Under this arrangement, it is true that the ship will be liable for all of the damages found by the judge or jury; yet its negligence may have been only a minor cause of the injury. The stevedore-employer may have been predominantly responsible; yet its liability is limited by the Act, and if it has lien rights on the longshoreman's recovery it may be out-of-pocket even less.

> . . . . . . . . . . . . .

> Under the Court of Appeals' proportionate-fault system, the longshoreman would get very little, if any, of the diminished recovery obtained by his employer. Indeed, unless the vessel's proportionate fault exceeded the ratio of the compensation benefits to total damages, the longshoremen would receive

nothing from the third-party action, and the negligent stevedore might recoup all of the compensation benefits it had paid.

. . . . . . . . . . . .

Some inequity appears inevitable in the present statutory scheme, but we find nothing to indicate and should not presume that Congress intended to place the burden of the inequity on the longshoreman whom the Act seeks to protect.

*Id.* at 268-70, 99 S.Ct. at 2760-61 (footnotes omitted).

¶14. We find *Edmonds* to be controlling in the present case. Here Ladner's family received benefits under the LHWCA; and therefore, it would not be proper to reduce the award against Accu-Fab and Anderson in proportion to the fault of Ladner's employer, Bracken.

¶15. Furthermore, we would reach the same conclusion even if the Longshoremen's and Harbor Workers' Compensation Act was not implicated. In *Estate of Hunter v. General Motors Corp.*, 729 So. 2d 1264 (Miss. 1999)*,* we stated:

This Court agrees with the aforementioned commentators that the policy considerations underlying the comparative fault doctrine would best be served by the jury's consideration of the negligence of all participants to a particular incident which gives rise to a lawsuit. A rule of law limiting a jury to a consideration of the fault of the parties at trial would permit a plaintiff to settle with a defendant primarily responsible for a given accident, file suit against a "deeper pockets" defendant who may bear little if any responsibility for the accident, and thereupon require the jury to allocate all of the responsibility for the plaintiff's injuries between the plaintiff and the non-settling defendant.

*Id.* at 1273 (footnote omitted).

¶16. Our decision in *Estate of Hunter* relied in part on a law review article Jonathan Cardi, *Apportioning Responsibility to Immune Nonparties: An Argument Based on Comparative Responsibility and the Proposed Restatement (Third) of Torts*, 82 Iowa L. Rev. 1293 (1997). In this article, Cardi discussed two approaches to handling the problem. He concluded that the better of the two approaches is to exclude the immune party from apportionment. *Id.* at 1331-36.

¶17. When the Connecticut Supreme Court addressed the issue, it also found that exclusion of the immune party from apportionment was the best approach. The Court further found that its decision was consistent with the majority of other jurisdictions which have decided the issue. *See **Durniak v. August Winter & Sons, Inc.**,* 222 Conn. 775, 610 A.2d 1277 (1992). We agree with the foregoing authorities that exclusion of the immune party from the apportionment process is the best approach. Therefore, we find this issue to be without merit.

### 3. Admissibility of OSHA Standards

¶18. Accu-Fab also argues that the Court of Appeals erred in finding that the trial court properly allowed OSHA standards to be admitted in conflict with this Court's decision in *Sumrall v. Mississippi Power Co.*, 693 So. 2d 359 (Miss. 1997). The Court of Appeals found that the OSHA standards were admissible to show the reasonableness of the actions of Accu-Fab and Anderson and whether they were consistent

with industry standards. ***Accu-Fab & Constr., Inc. v. Ladner***, No. 96-CA-00692-COA (Miss. Ct. App. Mar. 14, 2000).

¶19. In ***Sumrall***, we held that OSHA regulations are not admissible to show negligence on the part of the defendant. In so doing we stated:

> We are persuaded by the district court's reasoning and hold that, in light both of it and of this Court's clearly stated rule that governmental codes and regulations are not admissible unless given compulsory force by the state legislature, evidence of OSHA regulations is not admissible to show negligence.

***Sumrall***, 693 So.2d at 367.

¶20. However, M.R.E. 105 provides that evidence not admissible for one purpose may be admissible for another purpose provided a proper limiting instruction is given.

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

M.R.E. 105.

¶21. In the present case, the OSHA regulations were not admitted to show negligence on the part of Anderson and Accu-Fab, but rather they were admitted only to be used as a measure of reasonable care consistent with industry standards. Furthermore, there was a proper limiting instruction given by the trial court. "[T]he admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." ***Sumrall***, 693 So. 2d at 366 (citing ***General Motors Corp. v. Jackson***, 636 So.2d 310, 314 (Miss.1992); ***Walker v. Graham***, 582 So.2d 431, 432 (Miss.1991). We cannot say that the trial court abused its discretion in admitting evidence concerning the OSHA regulations to be admitted for limited purposes in this instance; and therefore, we find this issue to be without merit.

### 4. Admissibility of Marijuana Use

¶22. Finally, Anderson argues that the Court of Appeals erred in finding that the trial court properly excluded a positive test for marijuana and a marijuana cigarette found in Ladner's pocket at the time of the fall. Anderson argues that it was not responsible for the drug test being given, but rather that a nurse at the hospital mistakenly thought Ladner was an Anderson employee and ordered the drug test. Anderson therefore argues that the decision of the Court of Appeals conflicts with this Court's decision in ***Hughes v. Tupelo Oil Co.***, 510 So. 2d 502 (Miss. 1987). In ***Hughes***, we found that there was no basis to exclude blood alcohol test results in a civil context where the evidence was wrongfully obtained by a police officer who was not a party to the lawsuit. ***Id.*** at 505.

¶23. In the present case, however, the problem is not who ordered the samples drawn or who actually took them from Ladner, but that there was no evidence that Ladner was impaired at the time of incident. Anderson's foreman, Don Kellar, the individual who last saw and spoke to Ladner a few seconds before his death, specifically testified during his deposition that Ladner was not impaired in any form or fashion. In addition, there was not a proper foundation laid to demonstrate that the drug concentration was sufficient to impair Ladner's mental and motor skills to even the slightest degree, nor was there any proffer of such made by Accu-Fab or Anderson.

¶24. In *Pope v. McGee*, 403 So. 2d 1269, 1271 (Miss. 1981), this Court found that two six packs of warm beer and an unidentified white powder found in the defendant's car should have been excluded because they offered no proof on proximate causation of the collision, and its prejudicial value greatly outweighed its probative value. In so doing, the Court stated:

> There is no evidence that Sallee was intoxicated or that he had been drinking, the only evidence in the record was to the contrary. . . . Allowing evidence of the presence of these things in the Sallee automobile would be highly prejudicial and would shed no light on the proximate cause of the collision.

*Id.* at 1271.

¶25. Absent a showing that the marijuana level in Ladner's system was sufficient to impair him in the present case, we cannot say that the trial court abused its discretion in excluding the evidence. We therefore find this issue to be without merit.

## CONCLUSION

¶26. In the present case, there was no proof that Bracken had assumed any obligations, contractual or otherwise, to inspect the premises; and therefore, Anderson was not entitled to a directed verdict pursuant to our decision in *[Jones v. James Reeves Contractors, Inc.](#)*, 701 So. 2d 774 (Miss. 1997). Additionally, Accu-Fab and Anderson were not entitled to have Ladner's employer, Bracken, included in the apportionment of fault. Furthermore, we cannot say that the trial court abused its discretion in allowing evidence concerning the OSHA regulations to be admitted for the limited purposes here where a proper limiting instruction was given. Finally, we cannot say that the trial court erred in excluding the positive test for marijuana and the marijuana cigarette found in Ladner's pocket at the time of the fall because there was no foundation showing that Ladner was actually impaired at the time of the fall. We therefore affirm the judgments of the Court of Appeals and the Jackson County Circuit Court.

¶27. **AFFIRMED.**

> **BANKS AND McRAE, P.JJ., WALLER AND EASLEY, JJ., CONCUR. MILLS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COBB, J. SMITH AND DIAZ, JJ., NOT PARTICIPATING.**

> **MILLS, JUSTICE, DISSENTING:**

¶28. I respectfully dissent. Particularly, I would reverse on the marijuana issue. In this case Richard G. Ladner stepped through a six-foot-wide hole in plain daylight. Though this opening should have been properly secured, facts excluded below may have established that Ladner contributed to his demise. After the accident, Ladner was taken to the hospital where a nurse mistakenly thought he was an Anderson employee. Pursuant to the hospital agreement with Anderson, Ladner was tested for the use of illegal substances. Though he was tested as an Anderson employee, Bracken also had a policy with the hospital requiring post-accident testing of employees. Test reports indicated the use of marijuana, and the proffered testimony of Dr. David Wells, a toxicologist, would have established that Ladner had used marijuana at some point from one week to one hour prior to the time of the accident. Further, a marijuana cigarette was found in Ladner's pocket at the time of admission to the hospital. This cigarette, having been tested by the

Mississippi Crime Lab, was confirmed to be marijuana. Finally, Ladner had been convicted of possession of marijuana with intent to distribute in 1980 and served jail time from 1980 to 1984.

¶29. The majority opines that a proper foundation was not "laid to demonstrate that the drug concentration was sufficient to impair Ladner's mental and motor skills to even the slightest degree, nor was there any proffer of such made by Accu-Fab or Anderson." I submit that the fact that this employee stepped through a six-foot-wide hole in broad daylight suggests significant impairment of mental and motor skills, certainly to the "slightest degree" and that the proffered testimony of Dr. Wells would have placed in issue the usage of marijuana.

¶30. Evidence of marijuana use on the job should have been allowed in this case. Public policy and common sense dictate that every effort should be made to discourage drug use on all job sites, particularly on such dangerous jobs as a construction site.

¶31. I would reverse.

**COBB, J., JOINS THIS OPINION.**